Filed 10/27/21  P. v. Yanez CA6
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE VICTOR YANEZ,<br><br>    Defendant and Appellant. | H044528<br>(Santa Clara County<br>Super. Ct. No. C1518651) |

Following a trial, defendant Jesse Victor Yanez was convicted of four counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c))[1] and one count of assault with a firearm (§ 245, subd. (a)(2)).  The jury found the firearm enhancement allegations attached to each of those robbery counts to be true.  The court found true a Three Strikes allegation (§§ 667, subds. (b)-(i); 1170.12), a prior serious felony enhancement allegation (§ 667, subd. (a) (667(a)), and two prior prison term enhancement allegations (§ 667.5, subd. (b)).  Defendant was found not guilty of committing a robbery of a female victim on or about June 9, 2015, as charged in count 3.  The trial court sentenced defendant to a total of 36 years in prison and imposed on him certain financial obligations, including a mandatory minimum restitution fine of $300, a mandatory court operations assessment of

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

$200 (§ 1465.8 [$40 per criminal conviction]), and a mandatory court facilities assessment of $150 (Gov. Code, § 70373 [$30 per felony conviction]).[2]

On appeal, defendant contends that the prosecutor engaged in prejudicial misconduct during closing argument by offering his personal knowledge as to the usual behavior of robbers after they have made "a successful score" or "heist." Defendant asserts that defense counsel provided ineffective assistance by failing to object to that prosecutorial misconduct. He also asserts that the trial court (1) violated his due process rights under the Fourteenth Amendment to the United States Constitution by instructing the jury pursuant to CALCRIM No. 315 that it could consider the witness's level of certainty in evaluating a witness's identification testimony and (2) erred by not staying punishment on the assault conviction under section 654. Defendant argues that this court must remand the case to allow the superior court to (1) exercise its new discretion to strike the 10-year firearm enhancement (§ 12022.53, subd. (b) (12022.53(b)); (2) exercise its new discretion to strike the five-year enhancement for a prior serious felony conviction pursuant to section 1385, as amended; and (3) hold a hearing on his ability to pay the court facilities assessment (Gov. Code, § 70373), the court operations assessment (§ 1465.8), and the restitution fine (§ 1202.4. subds. (b), (c)) pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Lastly, defendant maintains that the abstract of judgment must be amended to accurately reflect the firearm enhancements attached to counts 1, 2, 4, and 5. We reverse the judgment and remand for resentencing.

## I. PROCEDURAL BACKGROUND

An information charged defendant with four counts of second degree robbery (counts 1-4) and one count of assault with a firearm (count 5).[3] The offenses were

---

[2] At sentencing, the trial court referred to the court operations assessment as a court security fee and to the court facilities assessment as a criminal conviction assessment.

[3] Steven Frank Jaramillo was charged as a codefendant in counts 1-2 and 4-5 of the original information.

alleged to have occurred in June or July of 2015. As to counts 1 through 4, defendant was alleged to have been armed with a firearm within the meaning of section 12022, subdivision (a)(1)). The information alleged that defendant had a prior conviction within the meaning of the Three Strikes law (§§ 667, subd. (b)-(i); 1170.12) and a prior serious felony conviction (§ 667(a)) based on the same prior robbery conviction. It also alleged that he had two prior prison terms within the meaning of section 667.5, subdivision (b).

On August 23, 2016, the court stated for the record that the People had submitted a first amended information and asked the prosecutor to state the changes for the record. The prosecutor indicated that the first amended information charged defendant with a second degree robbery committed on June 18, 2015 in a new count 4, which had inadvertently been omitted from the original information, to conform to the complaint and proof presented at the preliminary examination. The prosecutor indicated that as to count 3 and the new count 4, the first amended information alleged a firearm enhancement under section 12022.53(b). The prosecutor indicated that the former counts 4 and 5 were renumbered as counts 5 and 6 in the first amended information, similar to the complaint. At that time, the court ordered the first amended information filed.[4] Defense counsel on behalf of defendant waived arraignment, the advisement of rights, and the reading of the first amended information. The court stated for the record that the parties would proceed to trial based on the first amended information.

Following a jury trial, defendant was found guilty of all counts except count 3. The jury found true the firearm enhancement allegations attached to counts 1, 2, and 5

---

[4] A Clerk's Certificate indicates that the clerk was unable to locate the first amended information. The parties do not dispute that a first amended information was filed and that it renumbered counts 4 and 5 as counts 5 and 6; charged defendant with a new count 4, a second degree robbery committed on or about June 18, 2015; and alleged that defendant personally used a firearm in the commission of that offense within the meaning of section 12022.53(b).

(§ 12022, subd. (a)(1)) and the firearm enhancement allegation attached to count 4 (§ 12022.53(b)).  After a court trial, the court found the remaining allegations true.

At the time of sentencing, the trial court considered the many factors in aggravation, including the facts that defendant was on postrelease community supervision at the time of the offenses and that he had previously absconded from supervision.  The trial court sentenced defendant to a total term of 36 years.

Specifically, as to count 4, which it selected as the principal term, the court imposed a 10-year sentence under the Three Strikes law (5-year upper term doubled; see § 213, subd. (a)(2)) plus a consecutive 10-year firearm enhancement (§ 12022.53(b)).  As to each of counts 1, 2, and 5, the court imposed a consecutive two-year term plus a consecutive four-month firearm enhancement.  As to count 6, the court imposed a consecutive two-year term.  It imposed a consecutive five-year term for the prior serious felony conviction enhancement and two one-year prior prison term enhancements.

## II.    EVIDENCE PRESENTED AT TRIAL

### A.    *Robbery on June 2, 2015 (Count 1)*

On June 2, 2015, G.S. was working at his uncle's laundromat in San Jose.  He opened the laundromat at 5:55 a.m.

The laundromat had three surveillance cameras outside the business and six or seven surveillance cameras inside the business.  Surveillance videos were played at trial and admitted into evidence.

In the laundromat's surveillance videos, a gold vehicle could be seen pulling into and parking in the lot at 6:00 a.m.  Two men wearing black clothing could be seen exiting the vehicle and walking toward and entering the laundromat.  One man was wearing a black hooded sweatshirt with the hood covering his head; he was carrying a red bag.  The other man was wearing a black hooded sweatshirt and a black beanie; he was carrying a black bag with light-colored, contrasting straps and trim.

4

When the two men entered the laundromat, G.S. was in the back, attending to the machines. The surveillance videos showed the two men walking into the laundromat through the front door and proceeding through the interior toward G.S. The man with the red bag, who was in the lead, dropped the bag and jeans fell out of it; he was holding a handgun. The second man followed close behind. He had glasses and a mustache and was wearing black gloves.

The armed man pointed his gun at G.S. and said, "Take me to the money and we'll leave." G.S. was afraid and put up his hands. In the surveillance videos, the man with the black duffle bag could be seen walking toward the laundromat's office near the front of the laundromat. G.S was walking behind him with his hands up, followed by the armed man.

G.S. went into the office with the two men, and G.S. took roughly a thousand dollars out of a desk drawer and handed over the money. In the surveillance videos, G.S. could be seen standing with his hands up inside the office while the two men moved around the office. The man with the dark duffle bag unsuccessfully attempted to open a safe in the office using a cordless saw, which he had apparently brought with him. The men asked G.S. for his wallet, which contained credit cards and his ID. The men left the laundromat through the front door. The red bag and jeans were left behind.

A surveillance video showed the two men running out of the laundromat toward the gold vehicle. The man without a bag got into the vehicle's driver's seat, and the second man with the black duffle bag got into the front passenger seat. The vehicle backed up and was driven away.

At trial, G.S. estimated that the older of the two robbers was in his 50's or 60's and the younger robber was in his 20's or 30's. G.S. described the older man as Hispanic and said he wore glasses. G.S. said that the younger man had a tattoo under an eye.

5

After the incident, R.C., G.S.'s uncle, received a call from G.S., who said that he had just been robbed. R.C. drove to the laundromat and found that his nephew was "pretty well shook up." R.C. estimated that $600 to $700 was missing.

Officers with the San Jose Police Department responded to the laundromat. They uploaded surveillance video recordings of the robbery.

**B.  *Robbery on June 5, 2015 (Count 2)***

R.C.'s nephew did not want to return to work at R.C.'s laundromat. On June 5, 2015, R.C. opened the laundromat at approximately 5:45 a.m. On an outside surveillance camera monitor, R.C. saw a vehicle driving around. On the surveillance videos admitted into evidence, a dark sedan, which appeared to be missing its front right hubcap and have paint damage to its roof to the rear of a sunroof, could be seen entering the laundromat's back lot and then going in one direction and then the other direction on the driveway along the side of the laundromat's building. A young man then walked down the driveway from the back lot toward the front of the laundromat. He was wearing a black, zippered, hooded sweatshirt with a light-colored logo. As he moved out of view of the camera, he was pulling up his hood.

The young man entered the laundromat through the front door and asked R.C. for change for a $10 bill. The laundry machines operated with coins. The young man then checked his pockets and indicated that he had left his money in the car. Although the young man had a hood covering his head, R.C. saw his whole face. His sweatshirt had a distinctive Nike Air Jordan logo on it. The young man then walked out of the laundromat's back door. At trial R.C. described the young man as "Spanish" and said he had a mustache, a tattoo near an eye, and appeared to be in his 20's.

On a surveillance video, the young man and a second man, also dressed in black clothing, could be seen speaking to each other. The young man, now wearing white gloves, appeared to cover his nose and lower face with something black. The young man

6

walked back toward the laundromat's back lot. The second man, who was carrying a bag, walked down the driveway toward the front of the laundromat.

On a surveillance camera monitor, R.C. saw the young man with a black bandana across his face reenter the laundromat through the back door. The young man was carrying a gun. R.C. figured it was "the same guy that robbed" the laundromat three days earlier, and R.C. took the money out of the drawer and put it in the back room.

The second man passed by the laundromat's front doors, and then he walked into the laundromat and moved in behind the young robber. The second man was wearing black gloves and carrying a bag and a Taser. The young robber slid back the rack of a silver pistol, which made a clicking noise, put the gun to R.C.'s face, and asked for "all the money." R.C. was standing in the office behind a Dutch door, the lower half of which was closed. R.C. opened the lower half-door and said to the young man, "[Y]ou know where it is[;] you can go get it." The young man walked to the drawer from which the money had been taken on June 2, 2015, opened the drawer, and took the remaining money, approximately $40 to $50.

The second man, who appeared to R.C. to be in his 50's or 60's, walked into the office with a Taser and was "Tasering" in R.C.'s direction. The second man was also concealing his lower face, but his "mask" fell down. He tried to cover his face with his arm, but his arm dropped once in a while. He had wrinkly skin and a Fu Manchu mustache with some gray in it, and he was wearing glasses with gold rims. He asked in English for R.C.'s wallet. R.C. said, "I already gave you enough money . . . ." R.C. was scared. The second man allowed R.C. to keep his wallet. The young man asked for the keys to the change machine, and R.C. said that he did not keep the keys at the laundromat. They took R.C.'s business laptop.

R.C. was told to stay where he was and that he would be shot if he did not comply. The young man closed both halves of the Dutch door. Both robbers left quickly by the back door. R.C. watched them leave on a surveillance camera monitor, and he then

7

called the police. On a surveillance video, the sedan seen on the earlier videos could be seen driving away moments after the two robbers exited from the laundromat.

The San Jose Police Department responded to the robbery. R.C. spoke to San Jose Police Officer Vargas and gave him a copy of the surveillance videos.

At trial, R.C. identified defendant as one of the men who had robbed him on June 5, 2015. Defendant was the older man who had been trying to cover his face with his arm and had asked in English for his wallet.

### C.     Robbery on June 18, 2015 (Count 4, as amended)

On June 18, 2015, R.A. was working at a store that sold liquor and groceries. The store generally opened at 6:00 a.m. Approximately 15 to 20 minutes after she had opened the store, R.A. went to use the restroom. She heard a chime and went out. A man wearing a mask had entered the store, and he showed "a very big gun" and was moving it around. R.A. was very scared; she ran into the bathroom and bolted the door from the inside. When she heard a chime several minutes later, she thought another customer might have come into the store. She went to the office and looked at the monitor; she saw that a regular customer had come into the store.

When R.A. sold the customer a newspaper and took his money, she realized that the drawer that held money was gone. R.A. called the store's owner, B.S.

The police responded to the store. B.S. arrived after the police. R.A. seemed very nervous to B.S. The register's drawer where money was kept had been taken. About $100 to $150 had been kept in it.

The store had two surveillance cameras outside, and it had cameras inside as well. Surveillance videos were played for the jury. A man dressed in black with a bag slung cross-body over a shoulder walked toward the store's entrance. He pulled a shotgun out of the bag just before walking into the store. He was wearing a black beanie, black gloves, glasses, and something black over his nose and lower face. He went to the counter and pointed the gun at someone, presumably R.A., and moved the gun around.

8

R.A. fled. The armed man went behind the counter, he momentarily moved with the pointed shotgun in the direction in which R.A. had fled, and he then went to the cash register. He left the way he had come in, carrying the drawer under his arm.

### D. Robbery and Assault on July 7, 2015 (*Counts 5 and 6, as renumbered*)

On the morning of July 7, 2015, P.K., the owner of another laundromat in San Jose, received a phone call from a homeless man who had been helping him out in the laundromat. P.K. had allowed the man to come into the laundromat and take bottles for recycling. After P.K. had opened the laundromat, P.K. had given a key to the interior office to the homeless man and left.

Later, the homeless man reported to P.K. that he had been "hit and robbed." 911 was called. P.K. went to the laundromat, where he found the homeless man bleeding from the head. Money was kept in a desk drawer in the laundromat's office. P.K. indicated that $50 or $60 had been taken.

The laundromat had surveillance cameras inside. Surveillance videos of the July 7, 2015 robbery were played at trial. At about 5:41 a.m., a man walked into the laundromat. He was dressed in black and wearing a hooded sweatshirt, a beanie, and gloves; he was carrying a duffle bag over a shoulder. An armed man then walked into the laundromat. He was wearing a white, long-sleeved shirt under a shorter-sleeved black shirt, black pants, a baseball cap, black gloves, and something black over his nose and lower face. The armed man had a bag slung cross-body over a shoulder and was carrying a gun with a long barrel. The man pointed it at the homeless man and then repeatedly struck him with the barrel. The armed man appeared to be pulling something, apparently a key, away from the homeless man. During the attack, the other man restrained the homeless man, placed his hands over the homeless man's mouth and face, and then shoved him to the floor. The surveillance videos captured this other man's face and the shape of his head; he was wearing glasses and had a mustache.

9

A surveillance video taken inside the laundromat's office showed the armed man entering, grabbing wads of bills from the top desk drawer, riffling through the other drawers, and walking out. At 5:43 a.m., both robbers can be seen leaving the laundromat.

### E.    Police Investigation

Shortly after 6:00 a.m. on June 2, 2015, Matthew Kurrle, a San Jose police officer, and a police recruit he was supervising were dispatched to a laundromat. Once at the scene, they were asked to photograph evidence. Photographs were taken of a red bag and jeans, which were found on the laundromat's floor and were believed to have been left behind by the robbery suspects. The red bag contained, among other things, a 49ers shirt, a receipt from L & D Service Station, and a Home Depot receipt.

During the summer of 2015, Officer Rafael Varela was working in the robbery unit of the San Jose Police Department. On June 3, 2015, Officer Varela was assigned to investigate the June 2, 2015 laundromat robbery. He reviewed video recordings of the incident, which showed a suspect dropping the red bag in the laundromat. The officer began investigating the bag's contents, including a service station receipt and a Home Depot receipt, both dated June 1, 2015.

The department's video technician was sent to the L & D Service Station to try to obtain video corresponding to the specific date and time reflected on the service station receipt collected as evidence. The technician was unable to download any video at that time, but he brought back some photographic images. Officer Varela also reviewed a June 1, 2015 surveillance video of a Home Depot store.

On June 4, 2015, Officer Varela watched June 1, 2015 surveillance videos from the L & D Service Station. The videos and still images taken from the videos were shown at trial and admitted into evidence. They showed a dark green sedan, which had faded paint on the top behind a sunroof and a sticker on the lower right of its rear window. Its front right tire was missing a hubcap. The vehicle pulled up to a pump and a young man with a mustache entered the station's store to pay the cashier. He was

10

wearing a black, hooded, zippered sweatshirt with a Jordan logo. In the videos, Officer Varela saw the man return to his vehicle and take off his sweatshirt; he was wearing a San Francisco 49ers jersey underneath the sweatshirt. By reviewing the videos and the images, Officer Varela was able to connect the service station receipt left behind at the scene of the June 2, 2015 robbery to this young man, make a connection between him and a Honda sedan, and figure out part of the vehicle's license plate.

After the June 5, 2015 laundromat robbery, Officer Varela learned that this second robbery of the same laundromat was perpetrated by two males who appeared to be similar in ages to the perpetrators of the June 2, 2015 robbery. He reviewed the surveillance video of the June 5, 2015 robbery and saw the same green Honda with the faded paint behind the sunroof, the sticker on the rear window, and the missing hubcap. He saw part of the vehicle's license plate. The officer saw that one of the perpetrators appeared to be wearing a sweatshirt like the one that the young man in the service station videos had been wearing. The perpetrator's face appeared to be the same as, or similar to, the face of the young man at the service station as well. In the videos of the June 5, 2015 robbery, unlike the videos from the service station, Officer Varela could see the left side of the young man's face and a tattoo next to an eye.

Officer Varela was able to learn the Honda's full license plate by running the partial license plate information through a police database. From that information, the officer was able to determine the name and address of the Honda's registered female owner, M.L. In running the partial plate through police databases, the officer also learned that the vehicle was associated with a Virginia Place address. A male who had been arrested at the Virginia Place address had listed M.L. as his emergency contact. At trial, the officer explained that the license plate information used to associate the vehicle with the Virginia Place address was captured by a license plate reader on a police vehicle that drove through the City of San Jose.

11

A June 19, 2015 "CAD event" concerning a dispatch was entered into a police database. The "Events Details Report" indicated that the reporting party needed to pick up a vehicle with a specified license plate from a Virginia Place address and get the key from Jaramillo, who was refusing to return it. Using this and other information, Officer Varela was able to associate the Honda with Jaramillo. The officer looked at the DMV (Department of Motor Vehicles) photo database and saw that Jaramillo's DMV photo showed the distinctive tattoo on his face and that it listed the Virginia Place address as his address.

On June 23 and 24, 2015, Officer Joshua Cote conducted surveillance of the Virginia Place address. He was looking for the two vehicles of interest in the armed laundromat robberies. One was a gold SUV, and the other was a Honda with a certain license plate. On June 24, 2015, Officer Cote saw a four-door, gold Oldsmobile SUV with a certain license plate in the driveway of the residence. The vehicle appeared similar to the vehicle involved in the June 2, 2015 robbery.

Using the SUV's license plate number obtained from Officer Cote, Officer Varela learned the name and Almaden Expressway address of the SUV's female registered owner, D.C. Officer Varela ran a records check on the Almaden Expressway address, which was .7 miles from the laundromat involved in counts one and two. The officer discovered that the name Jesse Diaz was associated with the Almaden Expressway address. Officer Varela then ran a records check on Diaz and pulled a criminal mugshot photo. At that point, he believed that Diaz's photo and information matched the general description of the older suspect in the two laundromat robberies (counts 1 & 2). Diaz was 48 years old during the summer of 2015.

Officer Varela prepared a photographic lineup. Photograph No. 2 was a photograph of Diaz. A photograph of defendant was not in the lineup; he was not a suspect at that point. Officer Varela asked Detective Isidro Bagon to present the lineup.

Prior to administration of the photographic lineup, Detective Bagon was not involved in the investigation. He was trained to conduct "double-blind," photographic lineups, which meant that he was not involved in the case and did not know which of the photographs was a suspect's photograph.

On August 7, 2015, R.C. went to the San Jose Police Department to view a photographic lineup. Officer Varela was not in the room when R.C. looked through the photographs. Detective Bagon gave an admonition concerning the process to R.C. and presented the lineup. R.C. viewed six photographs, one at a time, and went through them again. When R.C. first saw photograph No. 2, he lingered on it. While looking at photograph No. 2 a second time, R.C. said, "[L]ooks darn close, the mustache." R.C. thought that the person in the photograph looked a little younger but resembled the perpetrator and that the perpetrator had more wrinkles. On the second go-around, R.C. indicated that photograph No. 6 also looked like the person. Detective Bagon understood from R.C.'s comments that R.C. thought that the people in photograph Nos. 2 and 6 looked similar to the perpetrator.

Also on August 7, 2015, P.K. brought a video of the July 7, 2015 robbery of his laundromat to the San Jose Police Department, and Officer Varela reviewed it.

In August of 2015, Bertrand Milliken, a San Jose police officer, watched a surveillance video of the elevator located in an apartment building at the Almaden Expressway address, which the parties stipulated was taken during the first week of July of 2015 and which was subsequently obtained by the police department's video technician. Officer Milliken recognized defendant, with whom he had spoken for an hour or more on July 16, 2015, in the video and in the courtroom at trial.

At approximately 7:50 a.m. on September 10, 2015, Officer Cote returned to the Virginia Place address as part of a "covert response unit," and remained there until approximately 2:00 p.m. The gold SUV was parked on the driveway during that entire time. At approximately 2:00 p.m., Jaramillo and a female left the residence and entered

13

the SUV. Jaramillo got into the driver's seat, and the woman got into the passenger seat. The officers followed the vehicle.

Jaramillo dropped the female passenger off and then drove to a business, where he parked, got out of the vehicle, and went inside. When Jaramillo left the business approximately 30 minutes later, he was arrested. Suspected methamphetamine and syringes were found on Jaramillo during the search incident to his arrest. At that point, the officer went into the business, located Diaz, and arrested him as well.

Also on September 10, 2015, Detective Bagon and Officer Cote were involved in the execution of a search warrant for an apartment at the Almaden Expressway address. Between a mattress and a box spring in one of the two bedrooms, Detective Bagon located a duffle bag. It contained a 28-inch-long, 12-gauge shotgun with a 16-inch barrel, seven live rounds of 12-gauge ammunition, and a pair of black and gray gloves. A pair of black shoes was found under the bed. Letters and bills found in the bedroom had the name "Jesse Diaz" on them. In a robbery surveillance video, a person wearing black gloves was holding a shotgun that was very similar to the one found in the bag.

On September 10, 2015, Diaz was interviewed by Detective Zanoto and Officer Varela. They eventually confronted Diaz with photographs that were still images taken from the video of the July 7, 2015 robbery at a laundromat. They accused Diaz of being in the photographs. Officers used the ruse of telling Diaz that his DNA had been found at the laundromat involved in counts 1 and 2. At some point, Diaz remarked that defendant and he looked alike. At the conclusion of the interview, Officer Varela collected Diaz's glasses because Diaz had indicated that defendant had worn the glasses. Clips from the recorded interview were played for the jury at trial.

During the investigation, Officer Varela submitted some items of evidence to the Santa Clara County Crime Lab for DNA testing. Those items included the 49ers shirt that had been left behind at the laundromat during the June 2, 2015 robbery; the duffle

14

bag that had been seized at the Almaden Expressway address; the shotgun that was found inside that bag; and the glasses collected from Diaz at the end of the police interview.

A criminalist with the Santa Clara County Crime Laboratory testified as an expert in "PCR DNA testing." She compared the DNA profile generated from the glasses to reference DNA samples from Diaz, defendant, and Jaramillo. Both defendant and Jaramillo were eliminated as DNA contributors, while Diaz and an unknown individual were possible contributors to the DNA mixture. The parties stipulated that she found that it was "10 million times more likely to obtain the DNA mixture taken from the glasses if Jesse Diaz, and an unknown individual, [were] contributors than if two unknown individuals [were] contributors."

The criminalist compared the DNA profile generated from the 49ers T-shirt to reference DNA samples from Diaz, defendant, and Jaramillo. She found that both defendant and Diaz were eliminated as DNA contributors, while Jaramillo and an unknown individual were possible contributors to the major DNA mixture. She found that it was "96 million times more likely to see this DNA mixture" if Jaramillo and an unknown individual were contributors than if "two random people" were contributors. The swabs of the firearm's trigger area and textured areas did not provide enough DNA information to allow the criminalist to make comparisons and draw conclusions.

### F.      Diaz's Testimony

Diaz, who was called to testify by the People, met Jaramillo in approximately March of 2015. Diaz had known defendant for about three years and described him as a friend.

At the end of May of 2015, Diaz was living in the two-bedroom apartment at the Almaden Expressway address. This was where Diaz's mother and his sister lived. In May of 2015, Diaz's girlfriend, Diaz's nephew and niece, and defendant were also living there.

15

Diaz testified that on approximately May 25, 2015, a family Memorial Day barbeque was held at the apartment. Diaz said that Jaramillo and defendant were also there and that they approached him about robbing laundromats with them. Diaz admitted that he initially agreed to join them, but testified that he later decided not to participate.

Diaz testified that shortly after Memorial Day, he fought with his mother and decided to move out of the Almaden Expressway apartment. According to Diaz, defendant continued to live there. Even after he moved out, Diaz still frequented the apartment.

Approximately a week after the barbeque, Diaz began working as an assembler for an HVAC manufacturing company. He was hired to work the swing shift, which was 3:30 p.m. to midnight, but he initially trained on the day shift. He was required to punch in and out of work with a timecard. Diaz was working for the company between June 1, 2015 and September 10, 2015.

According to Diaz, defendant told Diaz that Jaramillo and he had robbed a laundromat on June 2, 2015 and that they had been "masked-up." Diaz's timecard report showed that he clocked into work at 6:52 a.m. on June 2, 2015.

Diaz testified that a few days later, on June 5, 2015, defendant told Diaz that he had robbed the same laundromat again. Diaz's timecard report showed that he clocked into work at 6:53 a.m. on June 5, 2015. Diaz admitted at trial that he accepted stolen money from Jaramillo so that he could pay his rent.

On June 9, 2015, Diaz went home after working the swing shift and met up with defendant there at 1:00 or 2:00 a.m. Diaz testified that defendant told him that Jaramillo and he had just committed a robbery involving a woman. Evidence at trial showed that just after a female laundromat employee had locked up for the night, she was forced to reopen the laundromat by a masked man with a gun, which was "like a rifle," and she let the man into the laundromat's office. The employee thought that he had taken $600 to

16

$700 in cash; the laundromat's owner estimated that a little over $500 was taken.  The robbery, of which defendant was found not guilty, occurred at approximately 10:45 p.m.

The evidence did not show that Diaz was at work during the robbery on the morning of June 18, 2015.  An employee timecard report showed that on June 18, 2015, Diaz punched into work at 3:25 p.m. and punched out of work at approximately midnight.

At trial, Diaz stated that during the summer of 2015, he kept some of his clothes and belongings at his mother's Almaden Expressway apartment.  According to Diaz, he had moved back into the apartment a few months before his trial testimony on September 8, 2016.  That address was on his driver's license.

Diaz acknowledged that in August of 2015 he asked Jaramillo to get him a gun and explained that the reason for his request was that he was having "some problems" and "some guys were going to get [him] with a bat."  According to Diaz, Jaramillo brought him a duffle bag and told him that a gun was in there, but Diaz claimed to have never opened the bag or touched the gun.  He admitted that he knew there was a gun inside the bag because he had felt it through the bag.

On September 10, 2015, Diaz was at work when the police arrived.  He had some methamphetamine on him when he was arrested.  Diaz had used methamphetamine for a long time.

During the interview after his arrest, the officers confronted Diaz with photographs, which were "still frames" taken from the surveillance video of the July 7, 2015 laundromat robbery, and the officers said that he was in the photographs. Diaz told them that the person was not him and that the person was defendant.  Diaz signed the photographs and wrote defendant's name next to the person who he said was defendant.  At trial, Diaz testified that defendant was the man in the photographs.

Diaz was charged with the two robberies that were committed on June 2, 2015 and June 5, 2015 at the laundromat.  In May of 2016, Diaz pleaded guilty or no contest to

17

being an accessory after the fact to those robberies based on his taking of stolen money from Jaramillo. Diaz was subpoenaed to testify as a witness in this case, and the District Attorney's Office offered him immunity for that testimony.

At trial, after viewing surveillance videos of the June 2, 2015 laundromat robbery, Diaz testified that he recognized both men in the videos and identified them as defendant and Jaramillo. In a surveillance video of the June 5, 2015 robbery, Diaz identified Jaramillo as the person in the black hooded sweatshirt with a logo. In yet another video of that robbery, Diaz identified defendant as the man who was wearing a beanie. But when asked what made him think it was defendant, Diaz could not say. After viewing surveillance videos of the June 9, 2015 robbery, Diaz conceded that he could not recognize the masked man.

At trial, after watching a surveillance video of the June 18, 2015 robbery, Diaz testified that he recognized defendant as the man in the video. After watching a surveillance video of the July 7, 2015 robbery, Diaz testified that he recognized defendant in the video. He confirmed that defendant was the man who held the victim while the other man was hitting the victim with the gun.

At trial, Diaz confirmed that under the immunity agreement with the District Attorney's Office, his testimony in this case could not be used to prosecute him for the robberies but that he could be charged with perjury if he lied under oath or committed perjury. Diaz affirmed that that he had told the truth when he testified.

On cross-examination, Diaz acknowledged that he was convicted of felony possession of stolen property in 2008, that he concealed evidence in 2013 by swallowing "dope" and "methamphetamine" when he was pulled over, that he lied when he denied having anything in his pocket when he was detained by police at a Motel 6 on September 6, 2013, and that he lied in response to a question when he was detained by police on January 1, 2014. Diaz admitted that he did not tell police the truth when he was accused of committing crimes in 2013 and in 2014.

18

Diaz testified that he spent a lot of time with defendant in June of 2015. He denied telling the police during the interview on September 10, 2015 that he never "hung out" with defendant. After watching a video clip of that interview at trial, Diaz acknowledged that he had told police that Jaramillo and defendant did not "hang out." Diaz admitted that he might have said to police that he did not hang out with Jaramillo. Diaz acknowledged that Jaramillo and defendant committed some crimes together and that they were with him at the barbeque, which he conceded qualified as "hanging out." Diaz agreed that he saw Jaramillo all the time because they had worked together.

Diaz admitted that he had testified at a hearing the week before trial that defendant had hung out during the day at the Almaden Expressway address and had spent a few nights there. Diaz conceded that he had testified at trial earlier that day that defendant had lived there.

At trial, Diaz explained that his girlfriend was Denise and that Jaramillo had dated his girlfriend's daughter, D.C. On cross-examination, Diaz denied that D.C. had lived at the Almaden Expressway address or had been his girlfriend. He said that his girlfriend Denise lived with him and that it was D.C., not Denise, who drove the gold Oldsmobile SUV. He testified that he had let D.C. use the address to register her SUV even though she did not live there. Diaz admitted that he had driven the SUV a couple of times. Diaz testified that Jaramillo's grandmother lived at the Virginia Place address and that Jaramillo had lived there. Diaz had driven in the gold SUV with Jaramillo to that address.

At trial, Diaz acknowledged that when the police had asked him if he owned a gold SUV, he had said no. Diaz admitted that he might have initially told police that he did not know defendant and did not hang out with him. Diaz could not remember telling the police that his first conversation with Jaramillo and defendant about the robberies occurred at work in the middle of June. But Diaz then agreed that he had told police that they had "hook[ed] up" in the beginning or middle of June.

19

On cross-examination, Diaz acknowledged that he had lied during the previous week's testimony when he indicated that defendant had not told him about a robbery of a woman during the summer of 2015. Diaz maintained that he had talked to both Jaramillo and defendant about that particular robbery.

Diaz acknowledged that he wore glasses, which he claimed were just for reading. At the time of his arrest, Diaz was wearing glasses. During the police interview that followed, the officers indicated that the glasses worn by a person in a surveillance photograph appeared to be the same glasses that Diaz was wearing. Diaz told police that the glasses that he was wearing belonged to defendant. When police told Diaz that his DNA had been found at the scene of a laundromat robbery, Diaz first said that he went to that laundromat to wash his clothes. Diaz also told police that defendant and he shared clothing and that he had lent defendant the sweatshirt that defendant was wearing in the photograph.

By the time of trial, however, Diaz knew that in fact his DNA had not been found at the scene and the police had been using a ruse. He did not actually know whether the glasses in the surveillance photograph were actually the same glasses that he had been wearing during the police interview. He testified that defendant wore glasses all the time.

At trial, Diaz confirmed that he had a sleeve of tattoos covering his neck, and he was asked to stand up and tilt his head so the jury could see them.

### G.    Defense Case

Raul Flores, an investigator with the Santa Clara County Public Defender's Office, took photographs of defendant and Jaramillo in August of 2015, which were admitted into evidence. Investigator Flores also obtained Jaramillo's license photograph from the DMV, which was admitted into evidence. The same neck tattoos were visible in both photographs of Jaramillo. The parties stipulated that defendant had the tattoo depicted in defense exhibit G prior to June 2, 2015.

20

Using Google maps, investigator Flores determined that the distance between the laundromat involved in the robberies on June 2, 2015 and June 5, 2015 and the HVAC manufacturing facility was approximately 1.2 or 1.3 miles, or approximately a five-minute drive.

Upon investigator Flores's request to the DMV for the names of all persons having California driver's licenses or IDs associated with the Almaden Expressway or Road apartment, he obtained a certified list of eight people, which included Diaz but not defendant. Upon his requests to the DMV, he received two certified documents, one showing that a 1999 Oldsmobile with a certain license plate was registered to that Almaden Expressway apartment and another showing the address on Diaz's driver's license issued on January 14, 2016. But the investigator had not found any DMV records showing that Diaz had, through applying for a driver's license, associated himself with the Almaden Expressway address during the summer of 2015. Neither had the investigator found that Diaz was associated with the Oldsmobile in the DMV's records. Diaz's driver records reflected that Diaz was required to wear corrective lenses when driving.

A case manager and forensic assistant for the National Center for Audio and Video Forensics testified as an expert in the area of visual video forensics. He viewed the surveillance video from the July 7, 2015 robbery. In the video, the expert saw many examples of digital artifacts, which are visual alterations resulting from software that does not accurately reflect what was recorded. He stated that a digital artifact on a person's skin might be mistaken for a tattoo.

The expert also looked at photographs of defendant and Jaramillo that showed their neck tattoos. The surveillance video files from the July 7, 2015 robbery were enhanced to focus on the neck areas of the individuals in the video. The enhanced videos were played for the jury. The expert pointed out black spots, marks, or dots in the videos that were digital artifacts.

21

Dr. Kathy Pezdek, a psychology professor and cognitive scientist, testified as an expert in the area of eyewitness identification and memory. She testified at length regarding the three-stage process of memory, which included (1) perception or encoding, (2) storage, and (3) identification. She explained the factors that affected the accuracy of a person's perception or encoding of a memory: (1) the exposure time; (2) the presence of distractions; (3) the presence of a weapon; (4) the eyewitness's stress; (5) the perpetrator's use of disguise; and (6) the cross-race effect. The passage of time was the main factor affecting the second stage. The factor affecting the third stage was whether the identification procedure was "fair and unbiased." In her opinion, the factors she had discussed cast doubt on R.C.'s in-court identification of defendant. She explained in detail all the factors affecting that identification, including R.C.'s very short exposure time to the perpetrator (approximately a minute and a half).

## III. DISCUSSION

### A. *Alleged Prosecutorial Misconduct*

Defendant now claims that the prosecutor engaged in prejudicial misconduct when he suggested in closing argument that a robber would go celebrate after "a successful heist" and that he would not go to work. The prosecutor asserted that Diaz had an alibi for the June 2, 2015 and June 5, 2015 robberies because he clocked into work a short time after those crimes were committed. The prosecutor remarked in part, "Who goes to work after robbing laundromats? Who goes to work after robbing anything? What are you going to do after you rob some place, you are going to party. You are going to take the money and you're going to do something with it. You're certainly not about to go to work."

Defendant asserts that the prosecutor's remarks were "not proper argument based upon legitimate inferences that could be made from the evidence" and that the remarks were an improper reference to facts not in evidence and in effect prosecutorial testimony based upon personal knowledge. Defendant argues that the prosecutor's misconduct

22

violated federal due process because it undercut his defense that Diaz, rather than he, was the older perpetrator of the robberies committed on June 2, 2015 and June 5, 2015. He also contends that even if the misconduct did not constitute a due process violation, it resulted in a miscarriage of justice under state law.

"[I]t is misconduct for the prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 617.) However, "[c]ounsel may argue facts not in evidence that are common knowledge or drawn from common experiences. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1197.) " ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]" ' [Citation.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 439 (*Sandoval*).)

Defendant forfeited his claim of prosecutorial misconduct. " 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if an objection and admonition would have cured the harm.' [Citation.] The objection must be made on the same ground upon which the defendant now assigns error. [Citation.]" (*People v. Redd* (2010) 48 Cal.4th 691, 734.) "The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm. [Citations.]" (*People v. Powell* (2018) 6 Cal.5th 136, 171.) " ' "[T]he absence of a request for a curative admonition" ' may likewise be excused if ' " 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " ' [Citation.] 'A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough.' [Citation.]" (*People v. Daveggio*

23

*and Michaud* (2018) 4 Cal.5th 790, 853.) Defendant does not argue that a timely and specific objection was excused.

### B. *Alleged Ineffective Assistance of Counsel*

Defendant claims that defense counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's remarks now challenged.

#### 1. *Governing Law*

The standard for evaluating a claim of ineffective assistance of counsel is well established. It requires a two-prong showing of deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (*Id.* at p. 700.)

As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland*, *supra*, 466 U.S. at p. 688.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Id.* at p. 689.) "[E]very effort" must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Ibid.*) "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid.*)

The prejudice prong requires a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

#### 2. *Analysis*

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one,

24

or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) " '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' . . . [citation], and 'a mere failure to object to . . . argument seldom establishes counsel's incompetence' [citation]." (*People v. Centeno* (2014) 60 Cal.4th 659, 675.)

Here, defense counsel could have reasonably concluded that the challenged remarks, considered in context, were essentially an appeal to the jurors' common sense and a fair comment on the evidence of the relatively short interval between when the robberies charged in counts 1 and 2 took place and the time that Diaz clocked in at work on each of those dates. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 908.) The facts of that timing were in evidence, and such evidence related to the identity of a perpetrator. (See *Sandoval*, *supra*, 62 Cal.4th at p. 439 [prosecutor did not commit misconduct by arguing that the defendant had grown out his hair to deceive the jury].) Furthermore, in light of the instructions the trial court had just given them, there was no reasonable likelihood the jurors construed the prosecutor's remarks as asking them to rely on his personal knowledge outside of the evidence. "Counsel may not be deemed incompetent for failure to make meritless objections." (*People v. Coddington* (2000) 23 Cal.4th 529, 625, overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In addition, defense counsel could have made the reasonable tactical decision that it would be more effective to attack Diaz's credibility in his closing argument, which he vigorously did, and not to draw the jury's attention to the limited time between the burglaries and Diaz's arrival at work by objecting to the prosecutor's remarks. (See *People v. Huggins* (2006) 38 Cal.4th 175, 206.)

In any case, defendant has not established the prejudice prong of an ineffective-assistance-of-counsel claim. Just before the closing arguments, the trial court instructed

25

the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." The court told the jury that "[e]vidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." The trial court also instructed: "You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial."

Moreover, the jury saw both defendant and Diaz, who testified as a witness, in the courtroom and could compare their appearances to the robbers in the surveillance videos and still images taken from those videos. They were able to assess Diaz's credibility based upon his extensive testimony, the evidence that he had lied at times, and his own criminal history.

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 111-112.) Defendant has failed to establish his claim of ineffective assistance of counsel.

## C. *CALCRIM No. 315*

Defendant contends that the trial court violated his due process rights by instructing the jury that it should consider an eyewitness's "certainty" in evaluating the witness's identification testimony.

The trial court instructed the jury pursuant to CALCRIM No. 315 on eyewitness identification testimony. This instruction told the jury: "In evaluating identification testimony, consider the following questions: . . . How certain was the witness when he made an identification."

Defendant asserts that this portion of the instruction violated his due process rights because "it ratified the common misperception that a witness's certainty correlates with his or her accuracy" (italics omitted) and "abundant scientific research . . . has documented the unreliability of eyewitness identification . . . ." He contends that this alleged error requires reversal because it was not harmless beyond a reasonable doubt.

### 1. Background

At the "blackboard" preliminary examination, R.C. testified that he recognized defendant as the older man who had robbed him.[5]

Defendant made an in limine motion asking the court to exclude "any testimony by any eyewitness as to level of certainty of an identification," and he asked the court to modify CALCRIM No. 315 to remove the reference to witness certainty. The prosecutor opposed the defense request and argued that R.C.'s *lack of certainty* regarding a prior photo lineup (which did not include defendant's photo) was important for the jury to consider. The defense responded that the target of its request was "questioning by the People as to how certain are you about your in-court identification . . . ." The defense noted that it would be calling an expert on eyewitness identification. Defendant's trial counsel argued that "it really undercuts that witness' credibility when the Court then gives an instruction that tells the jury [that] they should consider something, which an expert witness has just told them is meaningless." The trial court declined to modify the

_____

[5] A "blackboard prelim" was described at the preliminary examination as a procedure employed where a witness has not previously identified the defendants. The defendants are seated behind "blackboards" until the witness has testified and then "unveil[ed]" individually to the witness so that the witness can testify as to whether he or she recognizes any of the defendants.

instruction. It concluded that an eyewitness's "statement of confidence" in his or her identification "goes to the weight of the testimony." "[T]he jury can give whatever weight they believe the testimony deserves."

R.C. made a courtroom identification of defendant at trial. He did not express any particular level of certainty when he did so. The prosecutor asked him: "[D]o you see either of the people who robbed you on June 5th?" R.C. responded: "Yes, he's sitting over there," and he specified that "He's wearing a green shirt." R.C. also answered "Yes" when the prosecutor asked if "Mr. Yanez, the defendant, is the person who robbed you on June 5th." R.C. testified at trial that he had described the older robber to the police as a Spanish man in his 50s, about 5 foot 7 inches tall, with "wrinkly" skin and a Fu Manchu mustache, who was wearing glasses with gold rims.

R.C. also testified that he had viewed a photo lineup (which did not contain any photos of defendant) and had told the police that two of the photos, one of which was of Diaz and the other of which was a "filler" photo, "looked like" the older robber. R.C. told the officer administering the lineup that those two photos "look close," but he "couldn't be positive . . . ." The officer who showed R.C. the photo lineup testified that he does not ask witnesses "how certain they are" when he shows them a lineup.

R.C. testified that the older robber was wearing a mask, but the mask slipped down at one point. On cross-examination, R.C. testified that he had told the police shortly after the robbery that he could identify the younger robber but was less sure that he could identify the older robber. Surveillance video of the robbery was played for the jury.

The defense presented an expert witness on "eyewitness identification and memory." She did not directly address eyewitness certainty, but she did testify that, "[u]nder certain circumstances people are overconfident about their ability to remember someone even when they're wrong . . . ." The defense expert testified that in-court identifications are unreliable in general and that R.C.'s in-court identification was

28

unreliable for a host of reasons, including his prior lack of certainty that he could identify the older robber, his responses to the photo lineup, the year-long time lapse between the robbery and his identification of defendant, and the cross-racial nature of the identification. The trial court instructed the jury that it "must consider" opinions given by expert witnesses.

### 2. Analysis

Defendant's claim that the witness certainty reference in CALCRIM No. 315 violated his due process rights was recently addressed by the California Supreme Court in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). The California Supreme Court held that the witness certainty reference in the instruction, "in the context of the trial record as a whole, . . . did not render [the defendant's] trial fundamentally unfair." (*Id.* at p. 646.) It noted that the instruction did not tell the jury that " 'certainty equals accuracy,' " the defendant had been permitted to call an eyewitness identification expert, and the trial court had instructed the jury that it was required to consider that expert's testimony. (*Id.* at p. 647.)

In *Lemcke*, the victim had identified the defendant in a photo lineup shortly after the crime, but she was " 'under anesthesia' " at the time of the identification. (*Lemcke*, *supra*, 11 Cal.5th at p. 648.) During subsequent identification procedures, the victim told the police " 'for sure it was [the defendant].' " (*Id.* at p. 649.) The victim also made an in-court identification of the defendant at trial. (*Id.* at pp. 649-650.) She testified that "it was 'impossible for [her] not to recognize his face.' " (*Id.* at p. 650.) The defense expert testified that witness certainty was relevant only when the identification occurred shortly after the event. (*Id.* at p. 651.)

On appeal, the defendant argued that the trial court's witness certainty instruction violated his state and federal due process rights. (*Lemcke*, *supra*, 11 Cal.5th at p. 653.) The court rejected his claim. It held that, when viewed in context with the other standard jury instructions, the witness certainty instruction did not " 'lower the prosecution's

29

burden of proof' " or interfere with the jury's evaluation of the credibility and reliability of the eyewitness's identification testimony. (*Id.* at pp. 657-659.) Nor did the instruction obstruct the defendant's right to present a defense, as he did by cross-examining the victim and presenting his eyewitness identification expert. (*Id.* at p. 660.)

Although defendant was given the opportunity to submit supplemental briefing after the California Supreme Court's decision in *Lemcke*, he did not do so, so he does not argue that this case is distinguishable from *Lemcke*. Nor could he. Indeed, in this case the witness certainty instruction could not have had any significance at trial as R.C. never expressed any certainty about his identification of defendant. He told the police shortly after the event that he was "not sure" he could identify the older robber. R.C. pointed to two photos of other men in the photo lineup as "close" to the older robber. He identified defendant only during in-court identification procedures, and defendant was permitted to present expert testimony that such procedures are unreliable. The same standard instructions that were given in *Lemcke* were given here, and defendant had a full opportunity to challenge R.C.'s identification of him.

Defendant points out that R.C. was the only "percipient witness" who identified defendant as the older robber, though he acknowledges that Diaz also incriminated defendant in this robbery. He discounts Diaz's testimony due to Diaz's motivation to persuade the jury that Diaz was not the older robber. But these circumstances do not have anything to do with the *witness certainty* instruction. We find no due process violation and reject defendant's contention.

### D.     *Multiple Punishment in Violation of Section 654*

Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for *the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision." (Italics added.)

30

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider [whether] the different crimes were completed by a 'single physical act.' ([*People v.*] *Jones* [(2012)] 54 Cal.4th [350,] 358.) If so, the defendant may not be punished more than once for that act." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*); see *id.* at p. 312.)

"Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives. [Citations.]" (*Corpening*, *supra*, 2 Cal.5th at pp. 311-312.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence. [Citation.]" (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

But as the People concede, substantial evidence does not support the court's determination that there was a separate objective for the assault with a firearm (count 6) that took place during the robbery in count 5. The evidence in the record before us shows only that the robbery and the assault were committed pursuant to a single intent and objective, i.e., to rob the victim. Therefore, the punishment for either count 5 or count 6 must be stayed. (§ 654, subd. (a).)

### E. New Discretion to Strike Firearm Enhancement

As indicated, the jury found true the enhancement allegation for personal use of a firearm, which was attached to count 4, and the trial court accordingly imposed a 10-year enhancement pursuant to section 12022.53(b). Relying on the retroactivity principles of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), defendant argues that this court must remand the case to allow the trial court to determine whether to exercise its new discretion to strike the firearm enhancement imposed under section 12022.53(b), as now permitted under section 12022.53, subdivision (h) (12022.53(h)), which was amended by

the passage of Senate Bill No. 620 (2017-2018 Reg. Sess.).  The People concede that defendant is entitled to a remand for that purpose.

Effective January 1, 2018, section 12022.53(h), was amended to provide, and still does provide:  "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (Stats. 2017, ch. 682, § 2; Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a).)  At time of the robbery to which the 10-year firearm enhancement attached, and at the time of sentencing, the subsection read:  "Notwithstanding [s]ection 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."  (Stats. 2010, ch. 711, § 5.)

Under the *Estrada* rule, "we presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' (*Estrada*, *supra*, 63 Cal.2d at p. 745.)  The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'  [Citation.]  'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.'  [Citations.]"  (*People v. Buycks* (2018) 5 Cal.5th 857, 881-882.)

Nothing in the appellate record clearly indicates that the trial court would have necessarily declined to strike or dismiss the 10-year firearm enhancement imposed under

32

section 12022.53 if it had had the discretion to do so. Consequently, we will remand to allow the trial court to consider whether to exercise its discretion to strike or dismiss the enhancement.

### F. New Discretion to Strike Prior Serious Felony Conviction Enhancement

As indicated, the trial court found true the enhancement allegation for a prior serious felony conviction and accordingly imposed a five-year enhancement pursuant to section 667(a). Defendant argues that under the retroactivity principles of *Estrada*, this court must remand this case to allow the trial court to consider exercising its new discretion to dismiss or strike the prior serious felony enhancement, as now permitted under sections 667(a) and 1385, as amended by the passage of Senate Bill No. 1393 (2017-2018 Reg. Sess.). Defendant raised this argument in a brief filed shortly before the amendments went into effect, and the People conceded in their brief that if the amendments took effect before his judgment is final, the law applies retroactively.

Effective January 1, 2019 (see Stats. 2018, ch. 1013, § 2; Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a)), section 1385 was amended to delete the provision prohibiting a judge from striking a prior serious felony conviction enhancement. Also, section 667(a) was amended to omit its reference to section 1385, subdivision (b). (See Stats. 2018, ch. 1013, § 1.) Section 1385 now permits a court "in furtherance of justice" to exercise its discretion to strike or dismiss a five-year enhancement for a prior serious felony conviction.

We agree that the trial court must be afforded an opportunity to exercise its discretion under current section 1385 to strike the five-year enhancement imposed under section 667(a). (See e.g. *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 268; *People v. Jimenez* (2019) 32 Cal.App.5th 409, 426.)

G.    ***Request for a Remand for an Ability-to-Pay Hearing in Light of* Dueñas**

Citing *Dueñas*, defendant argues that the trial court violated his federal due process, equal protection, and Eighth Amendment rights by imposing the minimum restitution fine (§ 1202.4. subds. (b), (c)), the court facilities assessment (Gov. Code, § 70373), and the court operations assessment (§ 1465.8) without first holding a hearing and finding that he had the ability to pay.

### 1.    *Probation Report*

The probation report filed on March 6, 2017 indicated that defendant was not interviewed at the request of defense counsel and that he provided no statement to the probation officer who prepared the report for sentencing. The report disclosed very limited information concerning defendant.

The report indicated that defendant was 46 years old when he committed the current crimes and that he was 47 years old at the time the probation report was prepared. According to the report, defendant had a lengthy history of criminal conduct, including five prior felony convictions, one of which was for armed robbery. The report stated that defendant was on PRCS (postrelease community supervision) when he committed the current offenses.

According to the report, defendant's probation officer while he was on PRCS had said that defendant was released on PRCS on November 17, 2014 and reported to probation on January 6, 2015. After defendant tested positive for methamphetamine, he was referred to cognitive-based therapy and an outpatient substance abuse program. Defendant stopped reporting to probation in March of 2015 and absconded from supervision.

### 2.    *The* Dueñas *Decision*

In *Dueñas*, an appellate court agreed that imposition of a restitution fine and court facilities and court operations assessments without considering defendant Dueñas's ability to pay violated state and federal constitutional guarantees because their imposition

34

"punishe[d] her for being poor." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.) The defendant had "cerebral palsy, and because of her illness she [had] dropped out of high school and [did] not have a job." (*Ibid*.) She was "an indigent and homeless mother of young children." (*Ibid*.)

The trial court had placed defendant Dueñas on probation for a misdemeanor violation and "imposed a $30 court facilities assessment under Government Code section 70373, a $40 court operations assessment under . . . section 1465.8, and a $150 restitution fine under . . . section 1202.4." (*Dueñas*, *supra*, 30 Cal.App.5th at 1162.) The defendant asked for a hearing to determine her ability to pay her appointed counsel fees and court fees, and the court later held an ability-to-pay hearing. (*Id*. at pp. 1162-1163) "The [trial] court concluded that the $30 court facilities assessment under Government Code section 70373 and $40 court operations assessment under . . . section 1465.8 were both mandatory regardless of Dueñas's inability to pay them. With respect to the $150 restitution fine, the court found that Dueñas had not shown the 'compelling and extraordinary reasons' required by statute ([§] 1202.4, subd. (c)) to justify waiving this fine." (*Id*. at p. 1163.) "The court rejected Dueñas's constitutional arguments that due process and equal protection required the court to consider her ability to pay" those assessments and restitution fine. (*Ibid*.)

On appeal, Dueñas argued that "imposing fines and fees on people too poor to pay punish[es] the poor for their poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) As to the court facilities and court operations assessments, the appellate court believed that their "potentially devastating consequences [for] indigent persons in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, at p. 1168.) The court identified some of the potential consequences: damage to a defendant's credit; interference with a defendant's other financial commitments, such as child support obligations; disruption of a

defendant's employment; and restriction of defendant's employment opportunities. (*Ibid.*)

As to the restitution fine, the appellate court in *Dueñas* stated: "Unlike the assessments discussed above, the restitution fine is intended to be, and is recognized as, additional punishment for a crime. (*People v. Hanson* (2000) 23 Cal.4th 355, 363.)" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) It observed: "As a result of . . . section 1202.4, subdivision (c)'s prohibition on considering the defendant's ability to pay the minimum fine, the criminal justice system punishes indigent defendants in a way that it does not punish wealthy defendants. In most cases, a defendant who has successfully fulfilled the conditions of probation for the entire period of probation has an absolute statutory right to have the charges against him or her dismissed. ([§] 1203.4, subd. (a)(1).) The defendant must be 'released from all penalties and disabilities resulting from the offense with which he or she has been convicted,' with the exception of driver's license revocation proceedings. (*Ibid.*; Veh. Code, § 13555.) But if a probationer cannot afford the mandatory restitution fine, through no fault of his or her own he or she is categorically barred from earning the right to have his or her charges dropped and to relief from the penalties and disabilities of the offense for which he or she has been on probation, no matter how completely he or she complies with every other condition of his or her probation. Instead, the indigent probationer must appeal to the discretion of the trial court and must persuade the court that dismissal of the charges and relief from the penalties of the offense is in the interest of justice. ([§] 1203.4, subd. (a)(1).)" (*Id.* at pp. 1170-1171.) The appellate court impliedly found these differences violated an indigent person's right to due process. (See *id.* at pp. 1171-1172.)

The appellate court concluded in *Dueñas* that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Dueñas*, *supra*, 30 Cal.App.5th at

36

p. 1164.) It also concluded that although "section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

### 3. *Forfeiture Rule*

The People argue that defendant forfeited his *Dueñas* claim because he did not raise it below and because there was no existing case law foreclosing the due process challenge that he now raises.

Here, the trial court imposed the minimum restitution fine of $300. Section 1202.4, subdivision (c), prohibited the court from considering ability to pay in imposing the minimum. That provision stated in pertinent part at the time of defendant's offenses in 2015 and at the time of sentencing in May of 2017, and still does state in pertinent part: "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine . . . ." (Stats. 2012, ch. 873, § 1.5; Stats. 2016, ch. 37, § 3.)

We are well aware that as a general rule, a criminal defendant's failure to object to financial obligations imposed upon a grant of probation or sentencing constitutes forfeiture of any appellate challenges to them. (See *People v. Aguilar* (2015) 60 Cal.4th 862, 864 [forfeiture rule applies to challenges to probation-related costs and appointed counsel fees]; *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854, 858 [forfeiture rule applies to challenges to probation supervision and presentence investigation fees].) Nevertheless, "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by

37

substantive law then in existence. [Citations.]" (*People v. Welch* (1993) 5 Cal.4th 228, 237-238.)

"In determining whether the significance of a change in the law excuses counsel's failure to object at trial, we consider the 'state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial.' [Citation.]" (*People v. Black* (2007) 41 Cal.4th 799, 811.) The forfeiture rule does not apply " 'when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change.' [Citations.]" (*Id.* at p. 810.) In applying the rule, we focus on "practical considerations as to what competent and knowledgeable members of the legal profession should reasonably have concluded the law to be." (*People v. De Santiago* (1969) 71 Cal.2d 18, 23.)

In *People v. Long* (1985) 164 Cal.App.3d 820, an appellate court rejected the defendant's argument that "[n]otwithstanding the apparently mandatory language of [former] section 1202.4, subdivision (a), . . . imposition of the $1,000 restitution fine at the time of his sentencing *without consideration of his ability to pay* constituted a denial of due process." (*Id.* at p. 824.) The court concluded that the imposition of a $1,000 restitution fine involved "no constitutional infirmity" since there was no suggestion that payment of the fine would be a condition of the defendant's release on parole or that his inability to pay the fine might result in further incarceration. (*Id.* at p. 828.) This has been the legal understanding for decades.

At the time of sentencing on March 6, 2017, the trial court was statutorily compelled to impose the mandatory assessments (§ 1465.8; Gov. Code, § 70373) and the minimum restitution fine (§ 1202.4, subds. (b), (c)). *Dueñas* was not decided until 2019.

In a footnote, the appellate court in *Dueñas* disagreed with the due process analysis in *Long*. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1172, fn. 10.) In *Dueñas*, the court took the unprecedented position that merely imposing an assessment or restitution fine without first considering a criminal defendant's ability to pay violated the state and

38

federal Constitutions "because it simply punish[ed] [the defendant] for being poor." (*Id*. at p. 1160.) "[N]o California court prior to *Dueñas* had held it was unconstitutional to impose fines, fees or assessments without a determination of the defendant's ability to pay. . . . When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture. [Citations.]" (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489.)

We conclude that the forfeiture rule does not apply because defense counsel could not have been expected to reasonably anticipate the change in the law represented by *Dueñas*. (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1034 (*Jones*).)

### 4. *Remand Not Required under* Dueñas

The People maintain that it can be presumed that defendant, who has been sentenced to 36 years in prison, has "the ability to satisfy the imposed assessments and [restitution] fine though his prison wages." They assert that defendant's due process claim fails because the record does not disclose that he will be unable to satisfy the challenged assessments and restitution fine. Defendant contends that paid work may not be available to him in prison and that, even if it is, the record does not demonstrate that he could earn enough to pay those amounts while in prison.

As indicated, the defendant in *Dueñas* was "an indigent and homeless mother of young children." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160) "She ha[d] cerebral palsy, and because of her illness she [had] dropped out of high school and [did] not have a job." (*Ibid*.) Unlike defendant Dueñas whose inability to pay going forward was evident, defendant has not cited any evidence in the appellate record that supports his asserted inability to pay, "beyond the bare fact of his impending incarceration." (*People v. Gamache* (2010) 48 Cal.4th 347, 409.) He chose not to give a statement to the probation officer preparing the presentence probation report. There are no facts in the record before

39

us to suggest that defendant, who is now only 50 years old, will be unable to work in prison.

Defendant has been sentenced to a lengthy prison term.  Section 2700 states in part:  "The Department of Corrections shall require of every able-bodied prisoner imprisoned in any state prison as many hours of faithful labor in each day and every day during his or her term of imprisonment as shall be prescribed by the rules and regulations of the Director of Corrections."  (See Cal. Code of Regs., tit. 15, § 3040.)  The pay rate for an inmate's paid assignment is "based upon the technical skill and productivity required for the assignment."  (CDCR 2019 Department Operations Manual § 51120.5.2, p. 355; see Cal. Code Regs., tit. 15, § 3041.2, subd. (a).)  The general pay schedule for inmates establishes the hourly and monthly pay rates, and the very lowest pay rate for the very lowest skill level is set at $0.08 per hour or $12 per month, for full time employment.  (Cal. Code Regs., tit. 15, § 3041.2, subd. (a); CDCR 2019 Department Operations Manual § 51120.6, p. 355.)  The highest monthly rate of pay is presently set at $56.  (CDCR 2019, *supra* § 51120.6, p. 355.)  While the wages are not much, they would add up over time, assuming that defendant, who has not shown or claimed otherwise on appeal, is physically capable of working.

While "[a]n inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct" (Cal. Code Regs., tit. 15, § 3040, subd. (k)), we do not accept that defendant necessarily will be unable to pay the challenged assessments and restitution fine due to indigency.  (See, e.g., § 1202.4, subd. (d) ["Consideration of a defendant's inability to pay may include his or her future earning capacity."])  In addition, it is not apparent on this record that defendant will have no other future sources of money, such as gifts, while in prison (cf. *People v. Potts* (2019) 6 Cal.5th 1012, 1055 [capital defendant had represented that "his only source of income was the small gifts he occasionally received"], 1057, fn. 13), some of which could be

applied toward the restitution fine.  (See, e.g., § 2085.5, subds. (a), (c), (e), (j), (m); Cal. Code Regs., tit. 15, § 3097, subds. (d)-(j).)

Courts have generally accepted that a defendant's ability to pay includes the prospect of earning wages in prison.  (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487; see also *Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140.)  Consequently, we conclude that a remand to determine defendant's ability to pay as was done in *Dueñas* is unnecessary to comport with due process.[6]

Aside from invoking *Dueñas*, defendant has not presented any legal analysis or cited legal authorities to support his assertion that the court violated his federal constitutional rights under the Eighth Amendment's excessive fines clause and his federal due process and equal protection rights by imposing the court facilities assessment, the court operations assessment, and a restitution fine without first finding that he had the ability to pay.  We deem constitutional arguments beyond *Dueñas*'s holding to be forfeited.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793; Cal. Rules of Court, rule 8.204(a)(1)(B); see also *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 51.)

### H.     *Amendment of the Abstract of Judgment*

Defendant argues that the abstract of judgment must be amended to accurately reflect the firearm enhancements attached to counts 1, 2, 4, and 5.  The People concede the point.  As to counts 1, 2, and 5, the jury found true the firearm enhancement allegations under section 12022, subdivision (a)(1).  As to count 4, the jury found true the firearm allegation under section 12022.53(b).  The original abstract of judgment does not correctly reflect those enhancements.  After resentencing upon remand, the trial court must ensure that an amended abstract of judgment correctly reflecting the sentence, including the firearm enhancements ultimately imposed, is prepared.

---

[6] In light of our conclusion, we do not decide in this appeal whether due process requires an ability-to-pay hearing before the court imposes an assessment or fine.

41

## IV.  DISPOSITION

The judgment is reversed.  We remand for a new sentencing hearing at which the trial court shall (1) determine whether to exercise its discretion pursuant to section 1385 to strike the 10-year firearm enhancement (§ 12022.53(b)), (2) determine whether to exercise its discretion pursuant to section 1385 to strike the five-year enhancement for a prior serious felony conviction (§ 667(a)), (3) stay the punishment imposed for either the robbery (count 5) or the assault with a firearm (count 6) pursuant to section 654, and (4) resentence defendant accordingly and ensure that an amended abstract of judgment is correctly prepared.

_____
ELIA, J.

WE CONCUR:


_____
GREENWOOD, P.J.



_____
GROVER, J.



*People v. Yanez*
H044528